IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NEHEMIAH LEARY | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 18-4347 |
| OFFICER VONDEL COOK, ET AL. | : | |

## MEMORANDUM

**SURRICK, J.**                                                        **MAY 12, 2020**

Presently before the Court is Defendants' Motion for Summary Judgment.  (Defs.' Mot.,
ECF No. 17.)  For the following reasons, Defendants' Motion will be granted.

## I.      BACKGROUND

In this civil rights action, Plaintiff asserts claims against Defendants under § 1983 and
Pennsylvania law, stemming from Plaintiff's arrest, prosecution, and two-month pretrial
detention for allegedly abusing his fourteen-year-old daughter.  (*See generally* Am. Compl., ECF
No. 14.)

### A.      **Factual Background**[1]

Plaintiff is the biological father of SH.[2]  (7/10/2017 Domestic Rape Arrest report, Plf.'s
Resp. Ex. 2, ECF No. 19.)  SH has a history of depression, suicidal ideation, psychosis,
aggressive behavior toward her biological parents and godparents, self-injurious behavior,
impulsive behavior, difficulty processing emotion, scratching herself, and swallowing objects.
(6/13/2019 Smith-Hubbard Dep. 79-85, Defs.' Mot. Ex. A.)  SH has received

---

[1] We view all of the facts and draw all reasonable inferences therefrom in the light most
favorable to Plaintiff, the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852
(3d Cir. 2006).

[2] Since SH is a minor, we refer to her by her initials.

psychopharmacological interventions through her outpatient therapy program, but her history of compliance with these medications was poor.  (*Id.* at 81.)  SH's mother has a long history of abusing drugs and neglecting SH.  (7/17/2019 Smith-Hubbard Dep. 23-25, Defs.' Mot. Ex. B.)

SH also has a history of alleging physical and sexual abuse by others.  In 2012, SH accused her mother's paramour of sexual abuse.  (Borah Dep. 46, Defs.' Mot. Ex. D; Webb Dep. 21, Defs.' Mot. Ex. H.)  In 2014, SH accused Plaintiff of physical and sexual abuse.  (Borah Dep. 45-46; Webb Dep. 20-21; SVU case file at D-3, D-29-31, Defs.' Mot. Ex. F.)

On February 5, 2016, SH was enrolled in the Wordsworth Academy Stars Program. (6/13/2019 Smith-Hubbard Dep. 42-43.)  Wordsworth is a residential treatment facility. (7/17/2019 Smith-Hubbard Dep. 10; 9/6/2016 DHS report, Defs.' Mot. Ex. C.)  On August 9, 2016, SH wrote in her diary about sexual and physical abuse by an unnamed man.  (6/13/2019 Smith-Hubbard Dep. 66.)  In mid-August 2016, after returning to Wordsworth from an overnight visit with Plaintiff, SH locked herself in a room and tried to hang herself.  (9/6/2016 DHS report; SVU case file at D-132.)

Child residents are permitted to leave Wordsworth for a few hours on a day pass with family and approved visitors.  (Prelim. Hr'g Tr. 6-7, Defs.' Mot. Ex. L; Webb Dep. 58.)  On Monday, September 5, 2016, Labor Day, SH left Wordsworth on a day pass with Plaintiff from 11:00 a.m. to 7:00 p.m.  (9/6/2016 DHS report.)  Because SH had previously accused Plaintiff of abuse, according to Wordsworth policy, the Wordsworth staff should not have permitted SH to go on a day pass with Plaintiff.  (6/13/2019 Smith-Hubbard Dep. 51, 59.)  At the time, SH was fourteen years old.  (Prelim. Hr'g Tr. 5.)

What happened during the eight-hour day pass is disputed.  Initially, SH told her roommate that Plaintiff had raped and punched her during that time.  (9/6/2016 DHS report.)

One year later, at the preliminary hearing, SH denied having been raped and punched, denied any injuries, and said that her left eye was swollen from ringworm.  (Prelim. Hr'g Tr. 18.)

On September 6, 2016, SH's roommate told Wordsworth staff that during the day pass Plaintiff had abused SH.[3]  (7/17/2019 Smith-Hubbard Dep. 11-12; 9/6/2016 DHS report.) Wordsworth sent SH to Children's Hospital of Philadelphia ("CHOP").  (9/6/2016 DHS report.) Between returning from the day pass and going to CHOP, SH had showered and changed her clothes.  (7/17/2019 Smith-Hubbard Dep. 61.)  When SH presented at the CHOP emergency department, she had a partial transection of the hymen, dried blood on her vulva and in her vagina, a blackened eye, and contusions to her face on the outer left eye area.  (9/6/2016 DHS report; SVU case file at D-139.)  A rape kit and physical evaluation were performed.  (9/6/2016 DHS report; SVU case file at D-138.)

Reports of sexual and physical abuse completed by Child Protective Services were sent to Philadelphia Department of Human Services ("DHS").[4]  (7/17/2019 Smith-Hubbard Dep. 26-27.)  Delores Smith-Hubbard, Multidisciplinary Team Investigator for DHS, received the reports and started to investigate.  (6/13/2019 Smith-Hubbard Dep. 9, 35; 7/17/2019 Smith-Hubbard Dep. 15-16; 9/6/2016 DHS report.)  Smith-Hubbard went to Wordsworth to collect information. (9/6/2016 DHS report.)  A Wordsworth supervisor told Smith-Hubbard: that SH had returned from a day pass with Plaintiff on September 5, 2016, tearful and with a left-eye injury; that SH had refused to be evaluated by a Wordsworth nurse; and that SH had disclosed to her roommate that Plaintiff had physically and sexually abused her.  (*Id.*)  Smith-Hubbard relayed this

---

[3] SH's roommate's identity has not been disclosed pursuant to the Child Protective Services Law.  55 Pa. Code § 3490.94.

[4] DHS is not legally permitted to reveal the reporting source.  (7/17/2019 Smith-Hubbard Dep. 26-27.)

information to her supervisor, Dr. Geeti Borah.  (*Id*.)  Smith-Hubbard then interviewed SH at

CHOP.  (*Id*.)  SH denied any sexual or physical abuse and said that she had caused the injury to

her face by scratching herself.  (*Id*.)  Smith-Hubbard took photographs of SH's facial injuries.

(*Id*.)  Smith-Hubbard and Dr. Borah agreed that SH was unsafe.  (*Id*.)  Smith-Hubbard attempted

unsuccessfully to contact Plaintiff by phone and in person.  (10/5/2016 DHS report.)  Unable to

speak with Plaintiff, Smith-Hubbard sent Plaintiff a letter.  (*Id*.)

      Based on the medical evidence alone, a CHOP social worker sent a report of child abuse

to the Philadelphia Police Department, Special Victims Unit ("SVU").  (9/6/2016 DHS report.)

In the early morning hours of September 7, 2016, Philadelphia Police Officer Felicia Seabron

responded to a radio call and interviewed SH at CHOP.  (SVU case file at D-40-D-41; Seabron

Dep. 10, Defs.' Mot. Ex. G.)  SH refused to talk to Officer Seabron.  (SVU case file at D-40-D-

41.)  Officer Seabron took the rape kit to SVU.  (Seabron Dep. 17; SVU case file at D-111-12.)

SVU Detective Webb was assigned to investigate.  (SVU case file at D-1; Webb Decl. ¶ 6, Defs.'

Mot. Ex. I.)

      Detective Webb has been a Philadelphia Police Officer since 1991.  (Webb Hist. 1-2,

Plf.'s Resp. Ex. 5.)  For the last nineteen years he has been assigned to the SVU.  (Webb Dep. 8-

9.)  In the SVU, he has dealt with over a thousand rape investigations.  (*Id*.)  During his twenty-

eight-year career, he had three complaints for "lack of service."  (Webb Hist. 1-2.)  He was

exonerated of all three.  (Webb Hist. 1-2; Webb Dep. 86-92.)

      On September 23, 2016, Maylis Feliz interviewed SH.  Feliz is a forensic interviewer at

Philadelphia Children's Alliance ("PCA").  (7/17/2019 Smith-Hubbard Dep. 49; 9/23/2016 DHS

Report; SVU case file at D-130-D-138.)  DHS contracts with PCA to conduct forensic interviews

in instances of alleged abuse of a minor.  (Borah Dep. 44; 6/13/2019 Smith-Hubbard Dep. 41.)

Feliz was selected for the interview because she had interviewed SH in 2014 about similar allegations concerning Plaintiff.   (9/23/2016 DHS Report.)  Detective Webb was not available to attend the interview.  SVU Detective Linda Blowes, in place of Detective Webb, and DHS investigator Smith-Hubbard viewed the interview in a separate observation room with a closed-circuit television.  (7/17/2019 Smith-Hubbard Dep. 54-55; SVU case file at D-130; Blowes Dep. 12, Defs.' Mot. Ex. J.)  SH told Feliz that Plaintiff had raped her and punched her in the left eye during the day pass two to three weeks prior.  (9/23/2016 DHS Report; SVU case file at D-2, D-136; Blowes Dep. 14-17.)  SH said that she returned to Wordsworth with a swollen eye and that she was sent to CHOP the next day.  (SVU case file at D-2; Blowes Dep. 17-18.)  SH also said that Plaintiff had "made her perform sex acts on the overnight stay 2 weeks prior to this incident but she was visibly shaken and did not elaborate on that."  (9/23/2016 DHS Report.)  SH claimed she had not told DHS investigator Smith-Hubbard and Officer Seabron about the abuse when they visited her at CHOP because she was afraid of Plaintiff.  (*Id*.)  SH claimed that Plaintiff had threatened her.  (*Id*.)

Smith-Hubbard consulted with Dr. Borah after the interview.  (*Id*.)  Dr. Borah recommended that Smith-Hubbard continue to try to contact Plaintiff.  (10/11/2016 DHS Report.)  In SVU Detective Blowes's notes from the interview, she noted that SH was on a day pass with Plaintiff on September 5, 2016, SH was treated at CHOP on September 6, 2016, and Plaintiff had been acquitted of raping SH in 2014.  (SVU case file at D-3.)

That same day, SVU Officer Ramon Carrasquillo interviewed SH's roommate who had first reported the abuse to Wordsworth staff.  (9/23/2016 Roommate Interview, Plf.'s Resp. Ex. 4; SVU case file at D-128-29.)  At the time, SH's roommate was fourteen years old.  (Webb Dep. 85.)  SH's roommate told Officer Carrasquillo that after SH had gone on a day pass with

5

Plaintiff, SH returned to Wordsworth crying and with an injury to the left side of her face. (9/23/2016 Roommate Interview; SVU case file at D-129.)  According to the roommate, SH said that Plaintiff had hit, raped, and threatened SH after they went skating.  (9/23/2016 Roommate Interview; SVU case file at D-129.)  SH's roommate said that the alleged abuse happened in late August, "like around the 20th," and that it was not the first time that Plaintiff had abused SH. (9/23/2016 Roommate Interview; SVU case file at D-129.)

On October 5, 2016, DHS investigator Smith-Hubbard and her supervisor Dr. Borah spoke by phone with Plaintiff regarding the alleged abuse.  (10/5/2016 DHS Report.)  Plaintiff admitted to seeing his daughter on September 5, 2016, but he denied the sexual and physical abuse allegations.  (*Id.*)  Plaintiff advised Smith-Hubbard and Dr. Borah that "witnesses . . . were around that can prove that [he] did not do anything."  (*Id.*)  Plaintiff said that he wanted to continue the rest of the interview in person.  (*Id.*)

On October 6, 2016, DHS determined that its investigation indicated sexual and physical abuse.  (6/13/2019 Smith-Hubbard Dep. 30.)  Dr. Borah sent an email to Detective Webb, which stated: "since you work the night shift, Ms. Hubbard is having a difficult time getting in touch with you to coordinate investigations and to ensure that our investigation does not taint your investigation."  (6/13/2019 Smith-Hubbard Dep. 25-26; SVU case file at D-113.)  PCA, DHS, and SVU conduct separate investigations and special care is taken not to taint or prejudice investigations.  (6/13/2019 Smith-Hubbard Dep. 37; Webb Decl. ¶ 4.)  DHS and SVU do not exchange documents.  (6/13/2019 Smith-Hubbard Dep. 26, 38, 55, 64.)

On October 6, 2016 and October 7, 2016, a trace laboratory report analysis was done on SH's vaginal swab, vulvular swab, perianal swab, rectal swab, oral swab, and panties.  (SVU case file at D-149-150.)  The results came back negative for semen and P30.[5]  (*Id*.)

On October 11, 2016, DHS investigator Smith-Hubbard interviewed Plaintiff in person about the events of September 5, 2016.  (10/11/2016 DHS Report.)  Plaintiff said that he had spent the day with SH on a day pass.  (*Id*.)  He had taken SH to his apartment to pick up socks.  (*Id*.)  Plaintiff's roommate "M" was at the apartment, but "[M] was in his room the entire time because he works 12hrs daily." (*Id*.)  He then took SH to her paternal grandmother's house in Norristown at 1:30 p.m.  (*Id*.)  There he noticed that SH had left-eye irritation and he gave her cream for ringworm.  (*Id*.)  SH also visited her paternal aunt's home a few doors down.  (*Id*.)  Plaintiff then took SH to the River Rink at Penn's Landing for ice skating and out to lunch at Applebees on 15th Street.  (*Id*.)  Plaintiff showed Smith-Hubbard a photo of SH ice skating and a photo of SH at Applebees, both taken on September 5, 2016.  (*Id*.)  Smith-Hubbard noted that "[SH] was seen in a picture at AppleBees somewhat sad with a bruise on her eye at 505pm." (*Id*.)  Smith-Hubbard does not recall contacting SEPTA, Penn's Landing, the River Rink, Applebee's, or any people mentioned by Plaintiff to corroborate Plaintiff.  (7/17/2019 Smith-Hubbard Dep. 40-44.)

On October 18, 2016, SVU Detective Webb reviewed a report detailing SH's 2014 allegations against Plaintiff.[6]  ( SVU case file at D-29.)  The report explained that due to a lack of corroborating evidence and credibility issues, prosecution had been declined.  (SVU case file

---

[5] P30 is "a glycoprotein produced almost exclusively by the prostate gland."  Joseph Peterson, et al., *Sexual Assault Kit Backlog Study*, https://www.ncjrs.gov/pdffiles1/nij/grants/238500.pdf (last visited May 8, 2020.)

[6] The SVU detective assigned to investigate the 2014 allegations against Plaintiff was Detective Manuel Gonzalez.  (SVU case file at D-29.)

at D-29-31; Webb Dep. 24.)  During the 2014 investigation, SH's foster mother had reported that

in the eight months that SH had lived with her, SH had talked about abuse by her stepfather, but

never about abuse by Plaintiff.  (SVU case file at D-30; Webb Dep. 26.)  Detective Webb took

this information into consideration, "but it didn't weigh that heavily with [his] investigation . . .

[b]ecause in 2014, it appears that she was reporting an incident -- a two year old incident and

there was no physical evidence.  And at the time [Detective Webb] had -- [Detective Webb] did

not have any interviews that would refute what -- the complainant's initial statement." (Webb

Dep. 24-25.)

Detective Webb also did not put much stock in SH's roommate's belief that the rape had

occurred in late August 2016 because "she had the dates wrong because she said she didn't know

the dates. She didn't remember" and "the witness got her dates wrong because it had been so

much time had passed between the interview and the date that she was actually told." (*Id*. at 64,

84.)  Detective Webb was unable to interview SH's roommate further because the roommate had

since been removed from Wordsworth.  (*Id*. at 51.)  Detective Webb also did not attempt to

ascertain through Wordsworth's records when SH had left the facility on a day pass with

Plaintiff.  (*Id*. at 56.)

In July 2017, Detective Webb consulted with two assistant chief district attorneys of the

District Attorney's Family Violence Sexual Assault Unit.[7]  (Webb Dep. 94; Webb Decl. ¶ 14.)

After receiving approval for an affidavit of probable cause from the assistant chief district

attorneys, Detective Webb sent his entire file to the District Attorney's Charging Unit.  (Webb

Dep. 30, 93-94; Webb Decl. ¶¶ 13-16.)  His file included "the signed interview record of SH's

---

[7] It is unclear from the record what documents from the SVU file, if any, Detective Webb showed to the two assistant chief district attorneys he initially consulted before submitting his entire file to the Charging Unit.

roommate, the video recording of SH's forensic interview, the PCA Team Interview Summary and Interview Impressions Report, Detective Linda Blowes' notes, the PARS Arrest Report, the 75-49 Investigation Report for this alleged sexual assault, the supplemental Investigation Report (75-52) for this alleged sexual assault, the 2014 75-49 investigation report of a prior allegation of sexual assault by SH against Plaintiff, the CHOP Evidence Collection Form, the rape kit property receipt, and the trace laboratory reports."  (Webb Dep. 30, 93-94; Webb Decl. ¶¶ 13-16.)  The Charging Unit approved the affidavit of probable cause and determined the charges to be filed against Plaintiff.  (Webb Dep. 82, 93-94; Webb Decl. ¶¶ 17-18.)

On July 3, 2017, Detective Webb submitted the affidavit of probable cause and criminal complaint to a magistrate to obtain an arrest warrant for Plaintiff.  (Webb Dep. 29, 82.) Detective Webb did not submit any other documents from his SVU file to the magistrate.  (*Id*. at 30.)  The affidavit alleged that the abuse had taken place on Saturday, September 3, 2016 at 9:00 pm.[8]  (Webb Dep. 30; SVU case file at D-56.)  The magistrate signed the arrest warrant, affidavit of probable cause, and criminal complaint, confirming that "there [was] probable cause for issuance of process."  (SVU case file at D-56–D-60.)

On July 10, 2017, Plaintiff surrendered to SVU with his attorney.  (*Id*. at D-52, D-55.) Police Officer Vondel Cook reported Plaintiff's arrest and prepared the "white paper" concerning Plaintiff's surrender to SVU.  (SVU case file at D-51–D-52, D-55; Cook Dep. 15-19, Defs.' Mot. Ex. K.)  Plaintiff was charged with rape, involuntary deviate sexual intercourse, contact with minor, statutory sexual assault, sexual assault, incest, unlawful restraint, indecent exposure,

---

[8] This date and time of the alleged abuse appear only in the documents contained in the SVU file.  "September 3, 2016 at 9:00 p.m." seems to originate in Officer Seabron's notes from her interview of SH at CHOP on September 7, 2016.  (SVU case file at D-40-41.)  Since SH refused to speak to Officer Seabron at CHOP, it is unclear from where or whom Officer Seabron acquired this date and time.  (*Id*.)

endangering welfare, corruption of minors, simple assault, recklessly endangering another person, false imprisonment, and indecent assault.  (SVU case file at D-51.)  Plaintiff was detained for about two months pending his preliminary hearing.  According to Plaintiff, he was fired and expelled during that time.[9]

At the preliminary hearing on September 6, 2017, SH was the only witness.  (Prelim. Hr'g Tr. 1-22.)  SH denied any abuse by Plaintiff.  (*Id*. at 7.)  SH testified that she had made up the alleged abuse because she was upset about "Christmas" and "[l]ittle things."  (*Id*. at 14.)  SH explained that her left eye had been swollen due to her picking and rubbing at ringworm.  (*Id*. at 18.)  SH denied that she had any other injuries when she returned from the day pass with Plaintiff.  (*Id*. at 13.)  SH did not explain why, when she was at CHOP, there was a partial transection of her hymen and dried blood on her vulva and in her vagina.  (*Id*. at 20-21.)  SH testified that she had told her Wordsworth therapist that she was lying about the abuse.  (*Id*. at 16.)  SH did not testify that she had told anyone else that she had been lying about the abuse.  (*Id*.)  At the conclusion of the preliminary hearing, Judge James Murray Lynn of the Municipal Court of Philadelphia did not make credibility findings regarding the testimony of SH.  (*Id*. at 22.)  Judge Lynn found that the Commonwealth's evidence was insufficient to go to trial.  (*Id*.) Judge Lynn discharged the criminal case.  (*Id*.)

Plaintiff began receiving therapy from John F. Kennedy Behavioral Health Center for Posttraumatic Stress Disorder and Major Depressive Disorder Unspecified, Recurrent Episodes. (JFK 1.)  Aggravating factors were "[b]eing incarcerated for 2 1/2 months- threatened with a knife."  (*Id*. at 3.)

---

[9] Plaintiff has not provided any evidence confirming his termination of employment and expulsion.  Plaintiff's records from the John F. Kennedy Behavioral Health Center indicate that Plaintiff's highest level of education completed was "Masters in Health Care Administration" and that he currently "[w]orks in a revenue department (P/T)."  (JFK 4, Plf.'s Mot. Ex. 6.)

### B.    Procedural Background

On October 9, 2018, Plaintiff filed a Complaint against Defendants.  (ECF No. 1.)  On November 2, 2018, Defendants filed an Answer to the Complaint.  (ECF No. 8.)  On December 11, 2018, Plaintiff filed an Amended Complaint.  (Am. Compl.)  On December 12, 2018, Defendants filed an Answer to the Amended Complaint.  (ECF No. 15.)  Plaintiff provided Defendants with an expert report by Walter Signorelli, Esq.  On September 13, 2019, Defendants filed a Motion for Summary Judgment.[10]  (Defs.' Mot.)  On October 24, 2019, Plaintiff filed a Response in Opposition.[11]  (Plf.'s Resp.)  On October 25, 2019, Defendants filed a Reply.  (ECF No. 20.)  On November 1, 2019, Plaintiff filed a Sur-Reply.  (ECF No. 21.)

The Amended Complaint alleges violations under 42 U.S.C. § 1983 including: false arrest, false imprisonment, and malicious prosecution (Count I); deprivation of federally protected rights under the Fourth and Fourteenth Amendments (Count II); duty to investigate (Count III); and failure to train, supervise, and discipline under *Monell* (Count IV).

---

[10] Attached to Defendants' Motion are the following exhibits, each marked with a letter: the 6/13/2019 deposition transcript of Delores Smith-Hubbard (Exhibit A); the 7/17/2019 deposition transcript of Delores Smith-Hubbard (Exhibit B); DHS reports and photos from 9/6/2016, 10/5/2016, 10/11/2016, and 9/23/2016 (Exhibit C); the deposition transcript of Dr. Geeti Borah (Exhibit D); Section 3000 Investigations, Assessments and Evaluations and the Philadelphia Department of Human Services Children and Youth Division Policy and Procedure Guide (Exhibit E); the SVU case file (Exhibit F); the deposition transcript of Detective Felicia Seabron (Exhibit G); the deposition transcript of Detective Mark Webb (Exhibit H); the declaration of Detective Mark Webb (Exhibit I); the deposition transcript of Detective Linda Blowes (Exhibit J); the deposition transcript of Officer Vondel Cook (Exhibit K); and the preliminary hearing transcript (Exhibit L).

[11] Attached to Plaintiff's Response are the following exhibits, each marked with a number: the report by Walter Signorelli, Esq. (Exhibit 1); the 7/10/2017 Domestic Rape Arrest report (Exhibit 2); the 10/11/2016 DHS report (Exhibit 3); the 9/23/2016 SVU interview record of SH's roommate (Exhibit 4); the Concise Officer History of Detective Mark Webb (Exhibit 5); the John F. Kennedy Behavioral Health Center letter and psychiatric evaluation of Plaintiff (Exhibit 6).

Plaintiff also alleges claims under Pennsylvania law including: malicious prosecution (Count V); and intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") (Count VI).

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id*.  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc*., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co*., *v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *Anderson*, 477 U.S. at 255).

## III.  DISCUSSION[12]

### A.    All Civil Rights Claims against Officer Vondel Cook (Counts I through V)

Plaintiff alleges civil rights claims against Officer Vondel Cook.[13]  (Am. Compl. ¶¶ 31-48.)  Officer Cook argues that the record reveals no evidence that she was personally involved in

---

[12] We must first determine whether we assign any weight to Plaintiff's expert report in our consideration of the summary judgment issues before us.  Plaintiff attached to his response in opposition to Defendants' Motion for Summary Judgment a report by Walter Signorelli, Esq. evaluating the actions and procedures by members of the Philadelphia Police Department in connection with the arrest and prosecution of Plaintiff.  (Signorelli Report, Plf.'s Resp. Ex. 1.)  In Signorelli's opinion, "[D]efendants violated the proper, accepted, and standard police practices and procedures for conducting a criminal investigation, and the [D]efendants' violations resulted in the wrongful arrest and prosecution of the [P]laintiff, Nehemiah Leary."  (Signorelli Report 5.)  Signorelli concluded that there was not probable cause to arrest Plaintiff because the police did not: corroborate the allegations in light of the inconsistent dates; investigate SH's credibility; and question Plaintiff and other witnesses who were present during SH's day pass with Plaintiff.

Defendants argue that Signorelli's report may not be considered on a motion for summary judgment because it was not accompanied by a sworn affidavit or a declaration made under penalty of perjury.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Regardless of the report's admissibility, our consideration of the report at summary judgment does not alter our conclusions.  In any event, Signorelli's points are captured in many of Plaintiff's arguments opposing Defendants' Motion for Summary Judgment.  Therefore, each of Signorelli's conclusions are addressed in our analysis.

[13] Plaintiff's Counsel orally stipulated to dismissal of Officer Cook at the conclusion of her deposition.  (Cook Dep. 20.)  However, a formal stipulation dismissing Officer Cook was never filed.

the investigation that led to the arrest, detention, and prosecution of Plaintiff.  Plaintiff responds

that Officer Cook knowingly and materially omitted exculpatory facts in her investigatory

reports which were the basis for an illegal affidavit of probable cause.  Plaintiff claims that

Officer Cook omitted the fact, in her investigative report, that SH's roommate told Detective

Gonzales that SH said the rape occurred on August 20, 2016.[14]

"Liability under section 1983 cannot be imposed absent personal involvement in the

alleged actions." *Surine v. Edgcomb*, 479 F. App'x 405, 407 (3d Cir. 2012) (citing *Rizzo v.

Goode*, 423 U.S. 362, 375-77 (1976)).  "[T]he tenet that a defendant's § 1983 liability must be

predicated on [defendant's] direct and personal involvement in the alleged violation has deep

historical roots in tort law principles." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d

Cir. 2018).  "In the § 1983 context, these principles have led the Supreme Court to require a

showing of direct responsibility by the named defendant and to eschew any theory of liability in

which defendants played no affirmative part in depriving any[one] . . . of any constitutional

rights, . . . including theories of vicarious or respondeat superior liability." *Id*. at 290 (internal

citations and quotation marks omitted).  "A defendant in a civil rights action must have personal

involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations

of personal direction or of actual knowledge and acquiescence.  Allegations of participation or

actual knowledge and acquiescence, however, must be made with appropriate particularity."

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Officer Cook's involvement in this matter was limited.  Officer Cook did not play a role

in any of the investigations.  She did not interview Plaintiff, SH, SH's roommate, or any

witnesses.  She did not prepare the affidavit of probable cause or seek the arrest warrant.  Officer

---

[14] Plaintiff is mistaken.  SH's roommate was interviewed by SVU Officer Ramon
Carrasquillo.

Cook simply wrote the police arrest report when Plaintiff surrendered to SVU.  The record reveals that Officer Cook was not personally involved in seeking the arrest warrant or investigating or prosecuting Plaintiff.  Officer Cook is entitled to summary judgment on all civil rights claims.  Since we have determined that Officer Cook is entitled to summary judgment on all civil rights claims, in later sections of this memorandum, we will not discuss any of Plaintiff's civil rights claims as they pertain to Officer Cook.

### B.      All Claims against Smith-Hubbard and Dr. Borah (Counts I through VI)

Plaintiff has alleged all six counts against DHS investigator Delores Smith-Hubbard and her supervisor, Dr. Geeti Borah.   (Am. Compl. ¶¶ 31-50.)  Smith-Hubbard and Dr. Borah contend they are immune from all Plaintiff's federal and state law claims pursuant to the Child Protective Services Law ("CPSL").  *See* 23 Pa. Cons. Stat. § 6318.  Defendants also argue that the claims should be dismissed because they were not personally involved in the alleged violations of Plaintiff's rights.  We address first Defendants' claims under the CPSL.

Under the CPSL:

Presumption of good faith. — An official or employee of the department or county agency who refers a report of suspected child abuse for general protective services to law enforcement authorities or provides services as authorized by this chapter shall have immunity from civil and criminal liability that might otherwise result from the action. . . .

For the purpose of any civil or criminal proceeding, the good faith of a person required to report pursuant to section 6311 (relating to persons required to report suspected child abuse) and of any person required to make a referral to law enforcement officers under this chapter shall be presumed.

23 Pa. Cons. Stat. § 6318(b),(c).  "Section 6318 of the CPSL grants social workers a good faith immunity from civil liability under state law. [Social workers'] good faith must be judged on an objective standard."  *Miller v. City of Phila*., 954 F. Supp. 1056, 1066 (E.D. Pa. 1997) (internal citations omitted).  As required by the CPSL, upon receipt of the report of suspected child abuse,

Smith-Hubbard immediately commenced an investigation and Dr. Borah supervised.  Smith-Hubbard spoke with Wordsworth staff, met with SH at CHOP and obtained information about SH's injuries, attended a PCA interview of SH, interviewed Plaintiff, and determined that her investigation indicated sexual and physical abuse.  There appears to be no evidence to defeat the presumption of good faith.  Accordingly, Smith-Hubbard and Dr. Borah are immune from Plaintiff's state law claims.  The CPSL, however, "cannot immunize the defendants from liability resulting from a violation of federal law."  *Good v. Dauphin Cty. Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1091 (3d Cir. 1989).  Therefore, Plaintiff's federal law claims against Smith-Hubbard and Dr. Borah are not dismissed under the CPSL.

Nevertheless, Smith-Hubbard and Dr. Borah are entitled to summary judgment on all federal civil rights claims based upon a lack of personal involvement.  Smith-Hubbard and Dr. Borah claim that they had no personal involvement in the alleged violations of Plaintiff's civil rights.  They argue that the DHS investigation was independent of the SVU investigation and that they did not assist the District Attorney's Office in the prosecution of Plaintiff.  Plaintiff argues that Smith-Hubbard omitted from her report the fact that SH's roommate had told Detective Gonzales that the rape occurred in late August 2016.  Plaintiff is mistaken.

SH's roommate made the statement to SVU Officer Ramon Carrasquillo, not Detective Gonzales or DHS investigator Smith-Hubbard.  In addition, the SVU and DHS investigations were independent.  Smith-Hubbard testified that she did not share reports with SVU.  Detective Webb testified that he did not submit any DHS reports to the Charging Unit.  Moreover, the contention that the DHS and SVU investigations were independent is further supported by the fact that reports from these two investigations do not reflect the same date for the alleged incident.  DHS reports reflect a date of September 5, 2016.  SVU reports reflect a September 3,

2016 date.  Moreover, neither Smith-Hubbard nor Dr. Borah testified against Plaintiff at the preliminary hearing.  Since Smith-Hubbard and Dr. Borah had no personal involvement in the SVU investigation, the arrest, and the prosecution of Plaintiff, they are entitled to summary judgment on all federal civil rights claims.  Since we have determined that Smith-Hubbard and Dr. Borah are entitled to summary judgment on all federal and state civil rights claims, in later sections of this memorandum, we will not discuss any of Plaintiff's federal and state civil rights claims as they pertain to Smith-Hubbard and Dr. Borah.

>    **C.**    **Section 1983 Claims of False Arrest, False Imprisonment, and Malicious Prosecution against Detective Webb (Count I)**

Plaintiff asserts claims against Detective Webb for malicious prosecution and violation of Plaintiff's Fourth Amendment right to be free from false arrest and false imprisonment.  (Am. Compl. ¶¶ 31-33, 47-48.)  Probable cause is an essential element of Plaintiff's false arrest, false imprisonment, and malicious prosecution § 1983 claims.  "To make out either a false arrest or false imprisonment claim, [a plaintiff] need[s] to demonstrate that his arrest was unsupported by probable cause."  *White v. Andrusiak*, 655 F. App'x 87, 90 (3d Cir. 2016).  In order for a plaintiff to prevail on a § 1983 claim for malicious prosecution, he must demonstrate that:

>    (1) the defendants initiated a criminal proceeding;

>    (2) the criminal proceeding ended in plaintiff's favor;

>    (3) the proceeding was initiated without probable cause;

>    (4) the defendants acted maliciously or for a purpose other than bringing the
>    plaintiff to justice; and

>    (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as
>    a consequence of a legal proceeding.

*Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).  A § 1983 malicious prosecution claim can be maintained against a police officer "if the officer knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." *Domenech v. City of Phila.*, No. 06-1325, 2009 U.S. Dist. LEXIS 34902, at *8 (E.D. Pa. Apr. 23, 2009) (internal citations and quotation marks omitted).

"Generally, 'the question of probable cause in a section 1983 damage suit is one for the jury.'" *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998)).  "This is particularly true where the probable cause determination rests on credibility conflicts." *Merkle*, 211 F.3d at 788.  "[A] district court may conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to [the plaintiff], reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly." *Id.* at 788-89 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).  "A court must look at the 'totality of the circumstances' and use a 'common sense' approach to the issue of probable cause." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007), (quoting *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984), *cert. denied*, 471 U.S. 1018 (1985)).

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal citation and quotation marks

omitted).  "Thus, we ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

We consider first whether the law was clearly established at the time of the alleged violation.  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The qualified immunity standard "gives ample room for mistaken judgments." *Malley*, 475 U.S. at 343.

In *Kelly v. Borough of Carlisle*, the Third Circuit held that:

> a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause. That reliance must itself be objectively reasonable, however, because 'a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one.' Accordingly, a plaintiff may rebut this presumption by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice.

622 F.3d at 255-56 (quoting *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004)).  "[E]ncouraging police to seek legal advice serves such a salutary purpose as to constitute a 'thumb on the scale' in favor of qualified immunity." *Kelly*, 622 F.3d at 255.  "Whether it would have been clear to a reasonable officer that probable cause justified [an] arrest requires an examination of the crime at issue[.]" *Gilles v. Davis*, 427 F.3d 197, 204 (3d Cir. 2005).  "Police officers generally have a duty to know the basic elements of the laws they enforce." *Kelly*, 622 F.3d at 258-59.

Detective Webb sought and received approval from the Charging Unit for the affidavit of probable cause. Consistent with *Kelly*, we analyze whether it was objectively reasonable for Detective Webb to rely on the Charging Unit's approval. Factors to be considered in assessing the objective reasonableness are the crimes at issue, the completeness and correctness of the information provided to the attorney, whether the police knew the information provided to the attorney was questionable, the attorney's neutrality, whether reliance on the advice of counsel was pretextual, and the timing of the probable cause determination. *See Berry v. Kabacinski*, No. 15-169, 2016 U.S. Dist. LEXIS 90078, at *37-39 (M.D. Pa. July 12, 2016) (recognizing qualified immunity where trooper sought advice from prosecutor, informed prosecutor what he had learned from his investigation, and relied in good faith on the advice of the prosecutor about the charges that should be filed); *Schmitt v. Farruggio*, No. 13-2007, 2014 U.S. Dist. LEXIS 113128, at *18 (E.D. Pa. Aug. 13, 2014) (finding no qualified immunity where police did not have to make split-second judgments, police withheld information from the prosecutor, and police's reliance on prosecutor's advice was questionable because police knew they could not intervene in the dispute); *Behne v. Halstead*, No. 13-0056, 2014 U.S. Dist. LEXIS 59109, at *74-75 (M.D. Pa. Apr. 29, 2014) (finding no qualified immunity where there were factual issues as to whether complete information was provided to counsel and because evidence supported the conclusion that defendant's reliance on counsel's advice was pretextual); *Spiess v. Pocono Mountain Reg'l Police Dep't*, No. 10-287, 2013 U.S. Dist. LEXIS 41814, at *49-51 (M.D. Pa. Mar. 26, 2013) (finding no qualified immunity where attorney was not neutral, detectives were aware of material inconsistencies in the witnesses' statements, and police were not in a situation where they had to make split-second probable cause decisions); *Weaver v. Beveridge*, No. 09-2357, 2012 U.S. Dist. LEXIS 187745, at *45-46 (M.D. Pa. Sep. 12, 2012) (finding qualified

immunity where plaintiff had not presented any evidence of wrongdoing on the part of the

officer to show that the officer's reliance on the prosecutor's advice was objectively

unreasonable); *Ciarlone v. City of Reading*, No. 09-310, 2011 U.S. Dist. LEXIS 5934, at *32-33

(E.D. Pa. Jan. 20, 2011) (finding no qualified immunity where it was unclear if the assistant city

solicitor was aware of all the facts and where the reasonableness of the officers' reliance on the

legal advice was questionable); *Kovala v. Steele*, No. 09-00801, 2011 U.S. Dist. LEXIS 50701,

at *19 (M.D. Pa. May 11, 2011) (recognizing qualified immunity where there was no evidence

officer made any misrepresentations to the district attorney and, considering the facts known to

the officer at the time and the elements of the crime at issue, a reasonable officer would have

relied on the district attorney's advice).

Plaintiff was charged with rape, involuntary deviate sexual intercourse, contact with

minor, statutory sexual assault, sexual assault, incest, unlawful restraint, indecent exposure,

endangering welfare, corruption of minors, simple assault, recklessly endangering another

person, false imprisonment, and indecent assault.  Detective Webb undoubtedly had familiarity

with the offenses charged because he had worked in the SVU for eighteen years.  In addition, it

was reasonable for Detective Webb to assume that the Charging Unit of the Philadelphia District

Attorney's Office was also familiar with these criminal offenses.

"Whether probable cause exists depends upon the reasonable conclusion to be drawn

from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543

U.S. 146, 152 (2004).  "[P]robable cause is defined in terms and circumstances sufficient to

warrant a prudent man in believing that the suspect had committed or was committing a crime."

*Merkle*, 211 F.3d at 789 (citing *Sharrar*, 128 F.3d at 817-18).  "Probable cause to arrest requires

more than mere suspicion; however, it does not require that the officer have evidence sufficient

to prove guilt beyond a reasonable doubt." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995).

Viewing the record in the light most favorable to Plaintiff, there were facts known to Detective Webb at the time that he sought legal advice for Plaintiff's arrest that supported a determination of probable cause for these offenses.  SH's September 23, 2016 interview with PCA forensic interviewer Maylis Feliz and SH's physical injuries noted at CHOP the day after she returned from the day pass with Plaintiff clearly support the elements of the criminal offenses charged.  SH told Feliz:

> AP [Alleged Perpetrator] came into SH's room. AP told her not to tell anybody. AP grabbed SH's shirt and pulled her pants down. AP put his "penis" inside of SH's "vagina". SH stated there was a lot of pressure in her "vagina" when AP put his "penis" inside. SH stated that there was blood on her pants and the sheets from her vaginal area. SH stated that her "vagina" was bruised and it hurt. AP put his "penis" that had the stuff that was on her (blood) in SH's mouth. AP told SH to stop screaming and punched her in the stomach more than one time. AP punched SH's left eye and told her to stop screaming. AP touched the skin of SH's "butt" with his hand.

(SVU case file at D-135, D-136.)  On September 6, 2016, SH presented at the CHOP emergency department with partial transection of the hymen, dried blood on her vulva and in her vagina, a blackened eye, and contusions to her face on the outer left eye area.  These two pieces of evidence support the offense elements of, *inter alia*, forcible compulsion, sexual intercourse with a 14-year-old, by a natural parent, touching of sexual or intimate parts, without consent, unlawful restraint, serious bodily injury, and exposing genitals.  In fact, based on the physical injuries alone, a CHOP social worker had sent a report of child abuse to SVU.

Next, we consider the information Detective Webb gave the Charging Unit when he sought legal advice.  Detective Webb declared under penalty of perjury that he gave the Charging Unit his entire file.  There were no more facts, collected by SVU or within the

possession of SVU at the time, that Detective Webb could have given to the Charging Unit.

Indeed, Detective Webb provided the Charging Unit with facts that potentially could have

undermined SH's credibility, such as the decision of the District Attorney's Office to decline

prosecution due to credibility issues in 2014, the trace laboratory report results that were

negative for semen and P30,[15] and SH's roommate's statement that the rape occurred on a

different date.[16]   The Charging Unit still approved the affidavit of probable cause and determined

the charges against Plaintiff.

　　　　Plaintiff is correct that Detective Webb did not give the Charging Unit a PCA interview

of Plaintiff.   However, PCA did not interview Plaintiff.   DHS did the interview.   Detective

Webb's investigation was separate from DHS's investigation and there is no evidence that DHS

provided Detective Webb with notes from its interview of Plaintiff.   Detective Webb admits that

he did not interview Plaintiff, or his sister, mother, or roommate.   However, Detective Webb is

not required to interview a suspect and rule out his claims of innocence.   It is "neither

uncommon, nor a barrier to probable cause" for an officer to not interview an arrestee and

ascertain his version of events before making an arrest.   *Anderson v. Goga*, No. 11-528, 2013

U.S. Dist. LEXIS 89142, at *10 (W.D. Pa. June 25, 2013).   "[P]olice do not have a constitutional

duty to investigate a defendant's protestations of innocence or to search for evidence of

affirmative defenses prior to making an arrest."   *Casselli v. City of Phila.*, No. 13-6279, 2016

U.S. Dist. LEXIS 143847, at *20 (E.D. Pa. Oct. 18, 2016).   "A reasonable, competent officer

---

[15] Smith-Hubbard suggests that the negative results were due to SH showering and changing her clothes before going to CHOP.   However, neither Plaintiff nor Defendant provided expert reports on this topic.

[16] Plaintiff argues that Detective Webb did not give the Charging Unit the notes from the SVU interview of SH's roommate; however, Plaintiff offered no evidence to support this argument.   Detective Webb declared under penalty of perjury that he gave this information to the Charging Unit.

may conclude that a putative defendant's protestations of innocence do not negate the
determination of probable cause because 'the protestations of innocence by an arrestee are so
common as to be virtually a matter of course.'"  *Id.* at *21 (quoting *Anderson*, 2013 U.S. Dist.
LEXIS 89142, at *3).

 Detective Webb also admits that he did not attempt to corroborate the date of SH's
alleged rape even though he knew SH's roommate had said the alleged rape had occurred around
August 20th.  However, such corroboration was not required.  Pennsylvania law tolerates such
date discrepancies by children.  In *Commonwealth v. Groff*, the Superior Court stated that "when
a young child is a victim of crime, it is often impossible to ascertain the exact date when the
crime occurred.  He or she may only have a vague sense of the days of the week, the months of
the year, and the year itself.  If such children are to be protected by the criminal justice system, a
certain degree of imprecision concerning times and dates must be tolerated."  548 A.2d 1237,
1242 (Pa. Super. Ct. 1988).  There is nothing particularly suspicious about two fourteen-year-old
children disagreeing on a date, especially when they are asked a few weeks after the alleged
incident.

 Next, we consider whether Detective Webb believed the information he gave the
Charging Unit was questionable.  Although SH recanted her allegations at the preliminary
hearing, there is no evidence that, at the time of arrest, Detective Webb believed SH was lying
about the abuse.  SH testified that she had told her Wordsworth therapist the abuse was a lie, but
SH did not testify that she had revealed this to anyone involved in the SVU investigation or
criminal prosecution of Plaintiff.  Moreover, Detective Webb considered the fact that the District
Attorney's Office had declined to prosecute Plaintiff in 2014 and determined that the
circumstances were different in 2016.  In 2014, SH was reporting an incident that had allegedly

occurred two years prior and there was no physical evidence of the alleged abuse.  In contrast, in 2016, SH was reporting an incident that had allegedly occurred only a couple of weeks prior and there was physical evidence to support it.

Next, we consider whether the Charging Unit attorneys were neutral.  Plaintiff failed to depose any of the attorneys involved.  As such, there is no evidence in the record showing that the Charging Unit attorneys were biased against Plaintiff.

Considering next whether Detective Webb's request for advice was pretextual, there is no evidence in this record indicating that Detective Webb's request for advice was pretextual.  In fact, affidavits of probable cause are routinely submitted to the Charging Unit for approval.  In addition, there is no evidence showing a lack of good faith on the part of Detective Webb.  There is no evidence that Detective Webb sought to harm Plaintiff, mislead the Charging Unit, or do anything other than bring Plaintiff to justice.

Finally, we consider the timing of Plaintiff's arrest.  Plaintiff was arrested ten months after the alleged incident.  "[Q]ualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split-second decisions."  *Reedy v. Evanson*, 615 F.3d 197, 224 n.37 (3d Cir. 2010).  Although Detective Webb did not need to make a split-second judgment in arresting Plaintiff, this factor does not tip the scale in light of the other factors.  *See e.g*., *Weaver*, 2012 U.S. Dist. LEXIS 187745, at *45-46 (recognizing qualified immunity where officer relied in good faith on prosecutor's informed advice that there was probable cause to arrest even though arrest took place months after the victim reported the abuse).

Plaintiff has failed to present evidence to overcome the presumption of qualified immunity. Based upon this record we cannot infer that it was objectively unreasonable for Detective Webb to rely on the advice of the Charging Unit.

Moreover, after receiving approval from the Charging Unit, Detective Webb sought and obtained an arrest warrant from a magistrate. *See Fiore v. City of Bethlehem*, 510 F. App'x 215, 220 (3d Cir. 2013) (noting that plaintiff's claim that his arrest was not supported by probable cause "starts at a severe disadvantage" because the officers relied on an assistant district attorney's legal advice and a neutral magistrate had issued an arrest warrant); *Handy v. Palmiero*, No. 17-3107, 2019 U.S. Dist. LEXIS 142639, at *18 (E.D. Pa. Aug. 22, 2019) ("Handy is twice disadvantaged because the uncontroverted evidence establishes that the warrant for his house was not only reviewed and approved by Magistrate Judge Bedford, but also by Assistant District Attorney Harrell.").

The Supreme Court has held that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith,'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)), unless "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U.S. at 341. For example, this would occur: (1) when the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923; or (2) when the officer, "with at least a reckless disregard for the truth, 'made false statements or omissions that create[d] a falsehood in applying for a warrant,' and . . . those assertions or omissions were 'material, or necessary, to the finding of

probable cause.'" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468-69 (3d Cir. 2016) (quoting *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)).

"'[A]n officer cannot be expected to question the magistrate's probable-cause determination' because 'it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'" *Messerschmidt*, 565 U.S. at 547 (quoting *Leon*, 468 U.S. at 921). "It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination." *Malley*, 465 U.S. at 346 n.9.

As a preliminary matter, there is no evidence in this record that the magistrate who issued the arrest warrant was not neutral. Moreover, Plaintiff has failed to convince us that no reasonably competent officer would have relied on the magistrate's probable cause determination here. The affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. The affidavit explicitly relied on statements made by the alleged victim at a PCA interview. The affidavit stated:

> The complainant, a 14 year old Black female, was interviewed on 9/23/16 by PCA Interviewer, Maylis Felz [sic], and states on 9/3/16 at approx. 9:00pm while on a home visit with her biological father, the suspect Nehemiah LEARY 33/B/M, at his residence at 333 N. 52nd St. he did sexually abuse her. The complainant states that Mr. LEARY came into her bedroom and told her not to tell anyone. Mr. LEARY then grabbed the complainant by her arms and pushed her down onto her bed. Mr. LEARY then ripped off her shirt and pulled her pants down. Mr. LEARY then vaginally penetrated the complainant with his penis against her will. Mr. LEARY then put his penis into the complainant's mouth and forced her to perform oral sex on him. Mr. LEARY then told the complainant to stop screaming and punched her several times in the stomach and in her left eye causing swelling.

(SVU case file at D-56.) Clearly, these statements reasonably support a probable cause determination for the offenses charged.

In order to challenge the warrant based upon the officer's conduct, "the plaintiff must prove, by a preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Sherwood*, 113 F.3d at 399. "Omissions are made with reckless disregard for the truth when 'an officer recklessly omits facts that any reasonable person would know that a judge would want to know' in making a probable cause determination." *Spiess*, 2013 U.S. Dist. LEXIS 41814, at *19 (quoting *Reedy*, 615 F.3d at 213.) "[A] court, when confronted with a false affidavit used to obtain a search warrant, must remove a falsehood created by an omission by supplying the omitted information to the original affidavit." *Sherwood*, 113 F.3d at 400. "As a final matter, we must determine whether . . . no genuine issue of material fact exists as to whether this corrected affidavit establishes probable cause." *Id*. at 400-01.

Under *Sherwood*, we examine whether Detective Webb made false statements or omissions in the affidavit of probable cause that created a falsehood in applying for the arrest warrant and also whether those false statements or omissions were material to the finding of probable cause. Detective Webb did not include in the affidavit: (1) the content of DHS investigator Smith-Hubbard's interview with Plaintiff; (2) the discrepancy between the dates provided by SH and her roommate; (3) that SH had previously accused Plaintiff of similar abuse and the District Attorney's Office had declined to prosecute due to credibility issues; and (4) the trace laboratory report results that came back negative for semen and P30. We do not consider the DHS interview of Plaintiff as an omission as it was conducted by DHS, not SVU, and there is no evidence in the record that Detective Webb was privy to the content of that interview.

Detective Webb testified that he believed the date discrepancy and the 2014 allegations did not impact the viability of the current accusations. Detective Webb did not comment on the importance of the trace laboratory report results. However, even if one were to conclude that Detective Webb recklessly disregarded the truth in making these omissions, those omissions obviously were not material to the finding of probable cause. The Charging Unit reviewed the entire SVU file. The SVU file included these omitted facts. After reviewing the SVU file, the Charging Unit approved the affidavit of probable cause.

Detective Webb reasonably relied in good faith on the Charging Unit's advice that the arrest was supported by probable cause. The objective reasonableness of Detective Webb's reliance is further supported by the fact that a neutral magistrate issued the arrest warrant. Any facts omitted from the affidavit of probable cause were a part of the SVU file reviewed by the Charging Unit before it approved the affidavit. Detective Webb is presumptively entitled to qualified immunity on the § 1983 claims of false arrest, false imprisonment, and malicious prosecution. Plaintiff has not rebutted the presumption. Therefore, we need not address the remaining element of qualified immunity, which is whether the facts alleged by the plaintiff show the violation of a constitutional right. Accordingly, Detective Webb is entitled to qualified immunity on Plaintiff's false arrest, false imprisonment, and malicious prosecution claims under § 1983.

In addition, there is insufficient evidence to satisfy the malice and initiation of criminal proceedings elements of the § 1983 malicious prosecution claim. The element of malice is unsupported as there is no evidence that Detective Webb had any purpose other than bringing Plaintiff to justice. The element of initiation of criminal proceedings is unsupported as there is no evidence Detective Webb knowingly provided false information to the prosecutor or

interfered with the prosecutor's informed discretion.  The uncontroverted evidence establishes that Detective Webb gave his entire SVU file to the Charging Unit.  Therefore, Detective Webb is entitled to summary judgment on Plaintiff's false arrest, false imprisonment, and malicious prosecution claims under § 1983.

### D.    Duty to Investigate Claim against Detective Webb (Count III)

Plaintiff claims that his rights were violated because Detective Webb: (1) failed to investigate previous false sexual assault claims made by SH; (2) failed to take basic required investigative steps to establish probable cause; (3) failed to reasonably interview witnesses; (4) failed to corroborate SH's allegations; and (5) intentionally omitted exculpatory facts from the affidavit of probable cause that Plaintiff did not have physical custody of SH on September 3, 2016, the date of offense in the criminal complaint and affidavit of probable cause.  (Am. Compl. ¶¶ 31-50.)  Detective Webb argues that there is no right to a thorough investigation, and, in the alternative, that the record shows that Detective Webb conducted a thorough investigation.

The Third Circuit has noted that it has "significant doubts about whether there is an independent substantive due process right to be free from a reckless investigation." *Johnson v. Logan*, 721 F. App'x 205, 208 n.9 (3d Cir. 2018) (citations omitted).  Many courts in this District are in agreement.  *See e.g.*, *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) ("The individual defendants argue that there is no independent constitutional cause of action for 'failure to investigate.'  The Court agrees."); *Wright v. City of Phila.*, 229 F. Supp. 3d 322, 332 n.3 (E.D. Pa. 2017) ("It certainly remains to be seen whether there is an independent cause of action under the Fourteenth Amendment . . . for 'failing to conduct a constitutionally adequate investigation,' and the Court will not affirmatively recognize one here at this time."); *Kelly v. Jones*, 148 F. Supp. 3d 395, 400 (E.D. Pa. 2015) ("I will not consider such failure to give rise to

a separate claim, but rather consider the officers' lack of investigation only as it pertains to the elements of a claim for malicious prosecution."); *Briscoe v. Jackson*, 2 F. Supp. 3d 635, 645 n.5 (E.D. Pa. 2014) ("the contours of a stand-alone claim for failure to investigate are not well-defined within this Circuit."). We agree with our fellow judges. At this juncture, there is no independent cause of action for failing to conduct an adequate investigation. Detective Webb is entitled to summary judgment on this claim.

### E.    Deprivation of Rights Claim against Detective Webb (Count II)

In Count II, Plaintiff makes a claim against Detective Webb for "depriv[ation] of rights and immunities secured under the Constitution and Laws of the United States, including but not limited to the right to be secure in this person, to be free from unlawful seizures, arrests, the right to be a parent and to be afforded due process and equal protection under the laws." (Am. Compl. ¶ 36.) This portion of Plaintiff's Amended Complaint is unintelligible. Defendants consider Count II and Count III as alleging a violation of the right to a thorough investigation. Despite being given the opportunity, Plaintiff failed to elaborate or clarify these claims. A right to a thorough investigation was addressed above. Any other claims encompassed in Count II are waived.

### F.    *Monell* Claims against Detective Webb and the City (Count IV)

Plaintiff alleges *Monell* claims against Detective Webb and the City of Philadelphia. (Am. Compl. ¶¶ 42-46.) To maintain a § 1983 claim against the City of Philadelphia, Plaintiff must show that Defendants caused a violation of Plaintiff's constitutional rights as a result of a municipal policy, custom, or practice. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). A policy is "an official proclamation, policy, or edict" by a decisionmaker with final

authority, and a custom is a practice that is "'so permanent and well-settled' as to virtually constitute law." *Id.* (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

The City's failure to adequately train, supervise, or discipline its police officers could subject it to liability where the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference can ordinarily be shown where the failure "has caused a pattern of violations." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). When there is no pattern of violations, Plaintiff must establish that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

With regard to a supervisory liability claim under § 1983 against Detective Webb, Plaintiff must:

(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that

(2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury,

(3) the supervisor was aware that this unreasonable risk existed,

(4) the supervisor was indifferent to the risk; and

(5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

*Brown*, 269 F.3d at 216 (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Sample*, 885 F.2d at 1118. "Rather,

the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Brown*, 269 F.3d at 216 (internal citation and quotation marks omitted).

With respect to the City's municipal liability, Plaintiff has not shown, with evidentiary support, a policy, practice, or custom that contributed to Plaintiff's alleged constitutional violation. Plaintiff has not established deliberate indifference through a pattern of violations in Detective Webb's work history or any other detective in the Philadelphia Police Department. The only evidence Plaintiff offers in support of his claim is that in Detective Webb's 28-year career with the Philadelphia Police Department, three complaints were filed against him for "lack of service." In all three instances, Detective Webb was exonerated. In addition, Plaintiff has not established deliberate indifference with evidence of inadequate training, supervision, or discipline. Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim.

With respect to Detective Webb's supervisory liability, Plaintiff has not put forth any evidence supporting his claim that his "rights were violated when Defendant Webb failed to reasonably supervise his underling detectives and officers assigned to plaintiff's criminal case to acquire alibi information readily available." (Plf.'s Resp. at 14.) As we explained above, although none of the officers from the SVU unit interviewed Plaintiff or anyone who could have corroborated Plaintiff's version of events, police officers are not legally required to do so. Moreover, Plaintiff told only DHS investigator Smith-Hubbard that he had witnesses who could corroborate his innocence. Detective Webb cannot be held liable for Smith-Hubbard's decision not to interview Plaintiff's witnesses because he was not Smith-Hubbard's supervisor. Detective Webb also was not privy to Smith-Hubbard's notes from her interview with Plaintiff. Plaintiff

has not established a failure to supervise by Detective Webb.  Accordingly, Detective Webb is entitled to summary judgment on this claim.

### G.   Supplemental Jurisdiction over State Law Claims

The Third Circuit has directed district courts to decline to exercise jurisdiction over state claims when the claims implicating original jurisdiction have been dismissed "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (citation omitted).  Defendants request this Court exercise supplemental jurisdiction over Plaintiff's state law claims out of respect for judicial economy, convenience, and fairness to the parties.  Defendants contend that the "facts developed through discovery in this case relate to and are intertwined in the federal and state law claims asserted by the plaintiff."  (Defs.' Mot. at 28.) We agree.  All claims stem from Plaintiff's arrest, imprisonment, and prosecution for allegedly abusing SH in 2016.  We will retain jurisdiction over Plaintiff's supplemental state law claims.

### H.   State Law Claim of Malicious Prosecution against Detective Webb (Count V)

Plaintiff asserts a claim for malicious prosecution against Detective Webb.  (Am. Compl. ¶¶ 31-33, 47-48.)  Under Pennsylvania law, "[a] cause of action for malicious prosecution has three elements.  The defendant must have instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff."  *Kelley v. Gen. Teamsters, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988).  Malice exists when the "primary purpose for which the proceedings were initiated was not to bring an offender to justice."  *Simpson v. Montgomery Ward & Co.*, 46 A.2d 674, 678 (Pa. 1946) (quoting RESTATEMENT OF THE LAW, TORTS § 672).  "A showing of probable cause to institute proceedings against a plaintiff establishes an absolute defense against an action for malicious

prosecution, which renders immaterial the issue of whether the prosecutor's motive is malicious or otherwise." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 984 (Pa. Super. Ct. 1997). "[P]robable cause is a reasonable ground of suspicion supported by circumstances sufficient to warrant that an ordinary prudent person in the same situation could believe a party is guilty of the offense charged." *Turano v. Hunt*, 631 A.2d 822, 825 (Pa. Commw. Ct. 1993). "Generally, it is the prosecutor, not the police officer, who is responsible for initiating a proceeding against a defendant. An officer may, however, be considered to have initiated a criminal proceeding if he or she knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." *Gatter v. Zappile*, 67 F. Supp. 2d 515, 521 (E.D. Pa. 1999) (internal citations and quotation marks omitted).

In Pennsylvania, "[c]riminal proceedings initiated upon advice of counsel are conclusively presumed to be supported by probable cause when the advice of counsel was sought in good faith and the advice was given after full disclosure of the facts to the attorney." *Kelley*, 544 A.2d at 942. "The attorney's advice need not be correct." *Williams v. Fedor*, 69 F. Supp. 2d 649, 671 (M.D. Pa. 1999). "So long as a person seeks the advice of counsel under the conditions set forth in section 666 [of the Restatement (Second) of Torts], he is entitled to rely on the advice." *Kelley*, 544 A.2d at 942. The Restatement (Second) of Torts § 666(1) provides:

§ 666. Effect of Advice of Counsel

(1) The advice of an attorney at law admitted to practice and practicing in the state in which the proceedings are brought, whom the client has no reason to believe to have a personal interest in obtaining a conviction, is conclusive of the existence of probable cause for initiating criminal proceedings in reliance upon the advice if it is

(a) sought in good faith, and

(b) given after a full disclosure of the facts within the accuser's knowledge and information.

"This reliance is warranted in view of the lengthy education and strict licensing of attorneys, as well as the continuing supervision of the legal profession exercised by this Court.  The advice of an attorney, while not infallible, is sufficient to protect against most abuses of prosecution, and will continue to be conclusive of the existence of probable cause, as it has been since *Stritmatter* was decided in 1943."  *Kelley*, 544 A.2d at 942.  In *Stritmatter*, the Pennsylvania Supreme Court held that the defendants were not liable for malicious prosecution because they had relied in good faith on the advice of an attorney after full disclosure of the facts within their knowledge. *Stritmatter v. Nese*, 31 A.2d 510, 515 (Pa. 1943).  The Court articulated its reasoning, "[a]nyone who has reason to believe that there is probable cause for prosecuting another has a legal right to undertake it.  If those who do so are to be penalized by having damages awarded against them because the prosecution fails, few will be rash enough to approach the courts for the vindication of criminal laws which they with good reason honestly believe have been violated to their personal injury and to the public prejudice."  *Id*. (quoting *Altman v. Standard Refrigerator Co*., 173 A. 411, 418 (Pa. 1934)).

Detective Webb is entitled to summary judgment on the state law malicious prosecution claim because the criminal proceedings against Plaintiff were instituted with probable cause and without malice.  Under Pennsylvania law, this Court must conclusively presume the existence of probable cause because Detective Webb sought the approval of the Charging Unit, after full disclosure of his SVU file, and relied in good faith on the approval of the Charging Unit. Detective Webb did not give the Charging Unit the PCA interview of Plaintiff because Plaintiff was never interviewed by PCA.  Plaintiff has not provided any evidence refuting Detective Webb's declaration under penalty of perjury that he gave the Charging Unit the SVU interview

of SH's roommate.  Also, there is no evidence that the Charging Unit was not neutral or that it was comprised of attorneys not admitted to practice or practicing in Pennsylvania.

Furthermore, there is insufficient evidence to satisfy the elements of malice and initiation of criminal proceedings.  The element of malice is unsupported as there is no evidence that Detective Webb had a purpose other than bringing Plaintiff to justice.  The element of initiation of criminal proceedings is unsupported as there is no evidence that Detective Webb knowingly provided false information to the prosecutor or interfered with the prosecutor's informed discretion.  The uncontroverted evidence shows that Detective Webb gave his entire SVU file to the Charging Unit.

In addition, Detective Webb is entitled to immunity under Pennsylvania's Political Subdivisions Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons. Stat. § 8541 *et seq*.  The Tort Claims Act grants state employees immunity from state law claims unless their conduct constitutes a "crime, actual fraud, actual malice, or willful misconduct." 42 Pa. Cons. Stat. § 8550.  "Willful misconduct" is "a demanding level of fault."  *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006).   Willful misconduct is "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied."  *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (citations omitted).  "In other words, the term 'willful misconduct' is synonymous with the term 'intentional tort.'"  *Id*. (quoting *King v. Breach*, 540 A.2d 976, 981 (Pa. Commw. Ct. 1988)). "The conduct of a police officer will only constitute 'willful misconduct' if the officer committed 'misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose.'"  *Waldon v. Borough of Upper Darby*, 77 F. Supp. 2d 655, 658 (E.D. Pa. 1999) (quoting *In re City of Phila. Litig*., 938 F. Supp. 1264,

1273 (E.D. Pa. 1996)).  There is no evidence here of a crime, actual fraud, actual malice, or willful misconduct by Detective Webb.  He is therefore entitled to immunity under the Tort Claims Act as to the state law malicious prosecution claim.[17]

## I.        IIED Claims against Detective Webb and Officer Cook (Count VI)

Plaintiff alleges an IIED claim against Detective Webb and Officer Cook.  (Am. Compl. ¶¶ 49-50.)  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998) (quoting RESTATEMENT (SECOND) TORTS § 46(1) (1965)).  Outrageous conduct has been defined by the Pennsylvania courts as conduct that is:

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Kazatsky v. King David Mem'l Park*, 527 A.2d 988, 991 (Pa. 1987) (quoting RESTATEMENT (SECOND) TORTS § 46(1) (1965)).  "[C]ompetent medical evidence of causation and severity" of emotional distress are required.  *Williams v. Guzzardi*, 875 F.2d 46, 52 (3d Cir. 1989).

Detective Webb and Officer Cook are entitled to summary judgment on this claim. Although Plaintiff provided some documentation for emotional distress allegedly caused by his incarceration, there is no evidence showing outrageous conduct by Detective Webb or Officer Cook.  Detective Webb was faced with allegations of sexual and physical abuse of a minor child, supported by the child's own statements and evidence of physical injuries.  In addition, Detective

---

[17] Officer Cook, Smith-Hubbard, and Dr. Borah would also be entitled to immunity under the Tort Claims Act as there is no evidence of a crime, actual fraud, actual malice, or willful misconduct on their parts.

Webb sought the approval of the Charging Unit and a neutral magistrate for Plaintiff's arrest. Officer Cook merely processed some of Plaintiff's paperwork when Plaintiff self-surrendered. An average member of the community would not consider these facts outrageous.

Also, Detective Webb and Officer Cook would be entitled to immunity under the Tort Claims Act. Viewing the record evidence in the light most favorable to Plaintiff, there is no evidence that Detective Webb or Officer Cook committed a crime, actual fraud, actual malice, or willful misconduct.[18]

### J.      NIED Claims against Detective Webb and Officer Cook (Count VI)

Plaintiff alleges a NIED claim against Detective Webb and Officer Cook. (Am. Compl. ¶¶ 49-50.) Defendants argue that Plaintiff's NIED claim is barred by the Tort Claims Act. We agree.

The Tort Claims Act waives the sovereign immunity of local governmental units with respect to only the following eight categories of "negligent acts": (1) Vehicle liability; (2) Care, custody or control of personal property; (3) Real property; (4) Trees, traffic controls and street lighting; (5) Utility service facilities; (6) Streets; (7) Sidewalks; and (8) Care, custody or control of animals. 42 Pa. Cons. Stat. § 8542(b). "[A] proper application of the rules of statutory construction dictates a strict and narrow interpretation of the eight categories of liability enumerated in section 8542(b)." *Casey v. Geiger*, 499 A.2d 606, 610 (Pa. Super. 1985) (citing 1 Pa. Cons. Stat. § 1924). "Moreover, a narrow reading of the eight categories of liability is also mandated upon consideration of the legislative intent to insulate political subdivisions from tort

---

[18] Although we already determined that Smith-Hubbard and Dr. Borah are immune to all state law claims under the CPSL, we note that their actions in conducting the DHS investigation were not outrageous, and that they would also be immune under the Tort Claims Act as there is no evidence of a crime, actual fraud, actual malice, or willful misconduct on their parts.

liability, as expressed in the preamble of the Act."  *Casey*, 499 A.2d at 610 (citing 1 Pa. Cons. Stat. § 1921).

Negligent infliction of emotional distress does not fall under any of the eight categories of "negligent acts."  Detective Webb and Officer Cook are entitled to immunity under the Tort Claims Act.[19]  *See e.g.*, *Allen v. Millsaps*, No. 18-00681, 2019 U.S. Dist. LEXIS 26840, at *20 (M.D. Pa. Feb. 19, 2019) (Under the Tort Claims Act, "[a]s municipal officials, Musselman and Millsaps are personally immune from liability for NIED claims."); *Whitenight v. Elbel*, No. 16-00646, 2017 U.S. Dist. LEXIS 199273, at *30 (W.D. Pa. Dec. 5, 2017) ("Because NIED is not an enumerated exception to the [Tort Claims Act], Warden Elbel is entitled to immunity for this claim and it will be dismissed with prejudice as to this defendant, as amendment would be futile."); *Gray v. Great Valley Sch. Dist.*, 102 F. Supp. 3d 671, 681 (E.D. Pa. 2015) ("Defendants argue that plaintiff's NIED claim should be dismissed because they are entitled to immunity under the [Tort Claims Act]. . . . [T]he Court agrees.").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted.[20] An appropriate Order follows.

BY THE COURT:


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**

---

[19] Smith-Hubbard and Dr. Borah would also be immune to the NIED claim under the Tort Claims Act.

[20] Because all Plaintiff's claims have been dismissed, we need not address damages.